UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| TRIREME MEDICAL, LLC,<br><br>  Plaintiff,<br><br>  v.<br><br>ANGIOSCORE, INC.,<br><br>  Defendant. | Case No. 14-cv-02946-LB<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>[Re: ECF No. 36] |

## INTRODUCTION

This is a case for correction of patent inventorship under 35 U.S.C. § 256. (ECF No. 1 at 2, ¶ 3.)[1] Plaintiff TriReme Medical, LLC's claims involve the alleged inventive contributions that a third party, Dr. Chaim Lotan, made to an angioplasty balloon catheter that defendant AngioScore, Inc. manufactures. AngioScore contends that Dr. Lotan assigned whatever rights he had in the device to AngioScore in 2003; TriReme argues that Dr. Lotan licensed his rights in the device to TriReme in 2014. The court concludes that Dr. Lotan assigned whatever rights he had to AngioScore under a 2003 consulting agreement. He thus had nothing to license to TriReme in 2014. TriReme has no interest in the subject patents sufficient to maintain a § 256 claim, and it

---
[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the tops of documents.

ORDER DISMISSING CASE 14-2946 LB

thus lacks standing. The court accordingly dismisses TriReme's case. *See, e.g., Larson v. Correct Craft, Inc.*, 568 F.3d 1319 (Fed. Cir. 2009); *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567 (Fed. Cir. 1997).[2]

## STATEMENT

This case concerns three patents issued on a medical device: a balloon catheter used in angioplasty to remedy obstructions (such as plaques) in the peripheral vascular system. (The relevant patents are: No. 8,080,026; No. 8,454,636; and No. 8,721,667 — all being U.S. patents. (ECF No. 1 at 2, ¶ 7; *see* ECF No. 37 at 10, 13.))[3] AngioScore owns these patents by assignment and manufactures the angioplasty balloon catheter to which they relate. The device's inventors include Dr. Eitan Konstantino (who founded AngioScore and later left to found TriReme) and Tanhum Feld. Dr. Chaim Lotan — who is not a party to this suit; and who is not listed as an inventor on the patents — is an Israeli cardiologist who claims to have contributed to early work on the catheter and so to have inventors' rights in the subject patents. Dr. Lotan entered into two contracts relevant to this inquiry. In 2003, he entered into a consulting agreement with AngioScore; under that agreement, Dr. Lotan assigned to AngioScore all his rights in inventions that he worked on, and which related to AngioScore's business, during the contract's term. (ECF No. 36-2 at 2-3.) AngioScore contends that Dr. Lotan thereby assigned to it all his rights in the subject patents. In June 2014, one day before TriReme filed this suit, Dr. Lotan granted TriReme an exclusive worldwide license to "exploit" his rights in those patents. (ECF No. 36-3 at 2-8.) Both contacts are more fully described below.

### I. THE 2003 CONSULTING AGREEMENT

AngioScore entered into a consulting agreement with Dr. Lotan in November 2003, though the agreement had a retroactive effective date of May 1, 2003. (*See* ECF No. 36-2 at 2, 5.) The agreement's terms are undisputed. Under the contract, in exchange for AngioScore stock options,

---

[2] Because it disposes of this motion on standing, the court does not address the parties' indispensable-party arguments under Rule 19.

[3] The parties have a separate patent-infringement case pending in this district. *See AngioScore, Inc. v. TriReme Med., Inc.*, 4:12-cv-3393-YGR

1   Dr. Lotan agreed to "advise [AngioScore] on product design, clinical trial design and
2   interpretation of clinical data," as well as "assist[ing AngioScore] with preclinical and clinical
3   testing of the Company's products." (*Id.* at 2, 7.) The contract does not name a particular product.
4   (*Id., passim.*) He also agreed to the following assignment of rights:

> **Assignment of Inventions.** Consultant agrees to promptly disclose to the Company and hereby assigns to the Company, or its designee, ***all right***, title and interest in and to ***all inventions***, original works of authorship, developments, ***concepts***, know-how, improvements or trade secrets, ***whether or not patentable***, that Consultant may solely or jointly conceive or develop or reduce to practice during the term of this Agreement that relate to the Services (collectively referred to as "Inventions").

(*Id.* at 3, ¶ 9(b) (emphases added).) This assignment was subject to an exclusion or "carve-out" term, by which Dr. Lotan could identify and retain his interest in preexisting inventions, so that no interest in those "prior inventions" would be assigned to AngioScore. The carve-out provided:

> **Inventions Retained and Licensed.** Consultant has attached hereto, as part of Exhibit C, a list describing all ***inventions, original works of authorship, developments, improvements***, and trade secrets which were made by Consultant prior to the date of this Agreement (collectively referred to as "<u>Prior Inventions</u>"), that belong solely to Consultant or belong to Consultant jointly with another <u>and</u> that relate to any of the Company's current or proposed businesses, products or research and development; or if no such list is attached, ***Consultant represents that there are no such Prior Inventions***. If, in the course of providing the Services, Consultant incorporates into a Company product, process or machine or into any Invention (as defined below), a Prior Invention owned by Consultant or in which Consultant has an interest, the Company is hereby granted and shall have a non-exclusive royalty-free, irrevocable, perpetual, worldwide license (with the right to sublicense) to make, have made, copy, modify, make derivative works of, use, sell and otherwise distribute such Prior Inventions as part of or in connection with such product, process, machine or Invention.

(*Id.* at 3, ¶ 9(a) (underlines in original) (italics added).) Dr. Lotan signed Exhibit C but, leaving the available space blank, did not list any "Prior Inventions." (*Id.* at 8.)

## II. DR. LOTAN'S WORK ON THE BALLOON CATHETER

Dr. Lotan's early work on the catheter is to a point undisputed. In April 2003, working alongside then AngioScore representatives, Dr. Konstantino and Mr. Feld, Dr. Lotan conducted an animal study in which he inserted prototype catheters into the blood vessels of an unfortunate pig. (*E.g.,* ECF No. 36 at 10-11; ECF No. 37 at 10-13.) For present purposes, the prototype catheter

1  had two salient features: a balloon and a "metal scoring element" that wrapped around the
2  balloon's outside. (ECF No. 36 at 8-9.) The uninflated device would be "snaked through" a
3  patient's (or a pig's) blood vessels. (*Id.* at 8.) Once it reached the target plaque inside the vessels,
4  "the balloon would be inflated and press itself and the metal on top of the balloon into the plaque,
5  thereby moving and compressing the plaque to increase the diameter of the opening in the
6  circulatory system and improve blood flow." (*Id.* at 8.) The balloon would then be deflated, with
7  the metal element returning "to roughly its original configuration," so that it could be safely
8  "snaked back out of the circulatory system." (*Id.* at 9.)

9      The pig study revealed a problem: in several attempts, in retracting the prototype device, the
10 metal element detached from the balloon. This made removing the catheter difficult. (ECF No. 36-
11 7 at 2-6.) In some cases the metal element was left behind entirely. (*Id.*) Within the next few days,
12 Dr. Lotan's lab wrote a report memorializing the results of the pig study. (*Id.*; *see* ECF No. 36-4 at
13 56-59, 80-83.) The report noted the problem with the metal detaching and made several
14 "recommendations" — at least some of which Dr. Lotan claims were his. (*See* ECF No. 36-4 at
15 56-59; ECF No. 36-7 at 2-6.) In short, the report suggested that both ends of the metal element be
16 fastened to the balloon. (The prototype had featured one fixed and one free-floating end.) At the
17 same time, this bond had to be flexible enough to allow the balloon to deflate and the wire to
18 return to its original position, thus enabling the device to be removed safely. (*See id.*; ECF No. 36-
19 4 at 26.) The study participants (including Dr. Lotan) shared one email and had two meetings
20 about the bonding issue, all in April 2003. (Lotan Dep. – ECF No. 37-2 at 57-58; ECF No. 37-8;
21 ECF No. 37-15, ¶¶ 9-11.)

22     The parties disagree over what, if anything, Dr. Lotan did in connection with the balloon
23 catheter after the April 2003 pig study. TriReme contends that Dr. Lotan made no further
24 contribution. (*See, e.g.,* ECF No. 37 at 17-21.) With the April 2003 study and report, in TriReme's
25 view, Dr. Lotan's contribution to developing the catheter was "complete[]." (*Id.*) AngioScore
26 responds that Dr. Lotan continued to work on issues related to the catheter, and did so under the
27 2003 consulting agreement. (*E.g.,* ECF No. 38 at 13-14.)

28     The evidence on Dr. Lotan's post-April 2003 work is as follows. There is no dispute that, after

1   April 2003, Dr. Lotan did not work on the physical design of the catheter. After that date, as Dr.
2   Lotan recounts matters, product design was turned over to AngioScore's engineers. (*See* ECF No.
3   36-4 at 20-21, 96-98, 147-48.) Dr. Lotan also testified, though, that after April 2003 he continued
4   to work on other catheter-related issues under the terms of his consulting contract with
5   AngioScore. (ECF No. 36-4 at 53-56, 74-75, 125-27.) He relates "talking" with AngioScore and
6   "plann[ing] on human studies" for the catheter in the summer of 2003. (*Id.* at 75.) Some of these
7   studies did not come to pass; some did. (*Id.* at 74-75.) Dr. Lotan not only helped "design[]" some
8   of these human trials (*id.* at 53-55); he personally conducted some of them (*id.* at 125-27). He also
9   testified that he was involved in the "interpretation of [this] clinical data" under the consulting
10  agreement. (*Id.* at 54.)

## III.   DR. LOTAN'S 2014 LICENSE TO TRIREME

Over the next decade, Dr. Lotan's relationship with AngioScore deteriorated; he could describe himself by late 2013 as being "furious" with the company. (Lotan Dep. – ECF No. 36-4 at 5.) He learned at that time that his AngioScore options had expired; the company's board reissued them, but at a price that, according to Dr. Lotan, made them "much less [valuable] than they really were." (*Id.* at 6.) Months later, believing that he had rights in the subject patents, Dr. Lotan discussed licensing them with TriReme. (*See id.* at 28-29.) In June 2014, Dr. Lotan entered into a contract with TriReme, under which he granted TriReme a license "to exploit the Lotan IP rights" — meaning, whatever rights Dr. Lotan had in the patents in suit. (*Id.* at 28-29; Licensing Agreement – ECF No. 36-3 at 2-3.) Dr. Lotan testified that, as he understands it, he has granted TriReme only a license, and that he, Dr. Lotan, continues to own his inventor's rights in the subject patents. (ECF No. 36-4 at 30.)

## GOVERNING LAW

TriReme brings this case under 35 U.S.C. § 256 to add Dr. Lotan as a named inventor of the patents in suit. (*See, e.g.,* ECF No. 1 at 1, 6.) A party invoking § 256 must satisfy constitutional standing requirements. *Larson v. Correct Craft, Inc.*, 568 F.3d 1319, 1325-27 (Fed. Cir. 2009); *Chou v. Univ. of Chicago*, 254 F.3d 1347, 1357 (Fed. Cir. 2001). "That is, the party must demonstrate that he has 'suffered an injury-in-fact, that the injury is traceable to the conduct

complained of, and that the injury is redressable by a favorable decision.'" *Informatics Applications Grp., Inc. v. Shkolnikov*, 836 F. Supp. 2d 400, 411 (E.D. Va. 2011) (citing *Chou*, 254 F.3d at 1357) (citing in turn U.S. Const. art. III, § 2 and *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)). To have standing under § 256, a party must assert either "expected ownership rights in the patent at issue" or a "concrete financial interest in the patent, albeit an interest less than ownership." *Shkolnikov*, 836 F. Supp. 2d at 411 (quoting in part *Chou*, 254 F.3d at 1358-59). One who assigns away his rights in a patent lacks § 256 standing. *See Larson*, 569 F.3d at 1326-27; *see also Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567, 1571-75 (Fed. Cir. 1997) (patent-infringement suit) (discussed in *Larson*).

## ANALYSIS

The court holds that Dr. Lotan assigned whatever rights he had in the subject patents to AngioScore in 2003. He had no rights in those patents to license to TriReme in 2014. TriReme thus has no actionable interest in those patents and no standing to pursue a § 256 claim to correct inventorship on the patents.

### I. DR. LOTAN ASSIGNED HIS RIGHTS TO ANGIOSCORE IN 2003

#### A. Basic Contractual Analysis

The parties' primary analytical dispute centers on whether Dr. Lotan completed his inventive contributions to the catheter before the May 1, 2003 effective date of his consulting agreement, or whether he continued to work after that date. TriReme contends (in sum) that Dr. Lotan's work — consisting of the April 2003 pig study and report — was "complete" before May 1, 2003; that, although that work entitles him to inventorship under patent law, it did not constitute a "Prior Invention" under the consulting agreement; and thus that he should be added to the subject patents as an inventor. AngioScore responds, first, that Dr. Lotan's work continued after May 1, 2003, so that any rights he had in the catheter were assigned under paragraph 9(b) of his consulting agreement. Second, and maybe more operatively, AngioScore argues that it is ultimately immaterial whether his work continued after May 1, 2003 or not; either way, because he did not list the April 2003 pig study (along with his subsequent report and recommendations) as a "Prior Invention" under the consulting agreement, Dr. Lotan failed to retain any rights growing out of

1  that study, and assigned all his interest in the catheter to AngioScore. (*See* ECF No. 38 at 4-8.) In

2  AngioScore's view, Dr. Lotan had nothing to license to TriReme in 2014 and TriReme thus lacks

3  standing to pursue a § 256 claim.

4  The court agrees with AngioScore. The question of when Dr. Lotan completed work is

5  ultimately immaterial: Even if his work was complete before May 1, 2003, under the express

6  terms of the consulting agreement, he assigned all rights in the catheter to AngioScore and

7  certified that there were no earlier inventions in which he was retaining an interest.

8  This conclusion follows from a straightforward application of the consulting agreement.

9  Under that agreement, Dr. Lotan agreed to provide AngioScore with consulting "Services." Those

10  services were defined as follows: "Consultant shall advise Company on product design, clinical

11  trial design and interpretation of clinical data. Consultant shall assist company with preclinical and

12  clinical testing of the Company's products . . . ." (ECF No. 36-2 at 2, 6.) There is no dispute that

13  the catheter was an AngioScore "product." In the contract's pivotal term, Dr. Lotan assigned to

14  AngioScore

> all right, title and interest in and to all inventions, original works of authorship, developments, concepts, know-how, improvements or trade secrets, whether or not patentable, that Consultant may solely or jointly conceive or develop or reduce to practice during the term of this Agreement that relate to the Services (collectively referred to as "<u>Inventions</u>").

18  (*Id.* at 3, ¶ 9(b) (underline in original).) The agreement also provided the following "carve-out,"

19  under which Dr. Lotan could identify and retain (*i.e.,* not assign to AngioScore) his rights in any

20  preexisting work:

> **Inventions Retained and Licensed.** Consultant has attached hereto, as part of Exhibit C, a list describing all ***inventions, original works of authorship, developments, improvements***, and trade secrets which were made by Consultant prior to the date of this Agreement (collectively referred to as "<u>Prior Inventions</u>"), that belong solely to Consultant or belong to Consultant jointly with another <u>and</u> that relate to any of the Company's current or proposed businesses, products or research and development; or ***if no such list is attached, Consultant represents that there are no such Prior Inventions***. If, in the course of providing the Services, Consultant incorporates into a Company product, process or machine or into any Invention (as defined below), a Prior Invention owned by Consultant or in which Consultant has an interest, the Company is hereby granted and shall have a non-exclusive royalty-free, irrevocable, perpetual, worldwide license (with the right to sublicense) to make, have made, copy, modify, make derivative works of, use, sell and otherwise distribute

>such Prior Inventions as part of or in connection with such product, process, machine or Invention.

(*Id.* at 3, ¶ 9(a) (underlines in original) (boldface and italics added).) Again, Dr. Lotan signed Exhibit C but did not list any "Prior Inventions." (*Id.* at 8.) He thus "represent[ed] that there [were] no such Prior Inventions."

From these undisputed points it would seem to follow that Dr. Lotan assigned whatever rights he had in the balloon catheter to AngioScore in 2003, retained nothing through the exclusion mechanism of paragraph 9(a), and so had nothing to license to TriReme in 2014. This conclusion is, as AngioScore rightly observes, independent of whether Dr. Lotan completed his inventive contributions to the catheter before or after the consulting agreement's effective date of May 1, 2003. Even if, as TriReme argues, Dr. Lotan completed his work by May 1, 2003, he still represented that there were no "Prior Inventions," as the consulting agreement defined that term, in which he was "retain[ing]" an interest.

### B. TriReme's Arguments

TriReme offers several arguments against that conclusion. The court has weighed them all carefully, but finds none of them convincing.

#### 1. *The exclusion term does not cover only "formal" inventions*

First, TriReme argues that by "Prior Inventions" the carve-out meant only complete inventions; that is, only "formal inventions already made, such as patents and patent applications." (ECF No. 38 at 19-20.) Dr. Lotan did not consider his April 2003 work to constitute a "formal invention[]" and so did not list them in the carve-out's Exhibit C. (*Id.* at 20 and n. 2.) His pre-May 1, 2003 work entitled him to inventor status under the patent law, TriReme argues, and thus to a § 256 correction; but that work did not itself rise to the level of a "formal invention" and so did not need to be listed on Exhibit C to be saved from assignment.

The express language of the consulting agreement precludes this argument. What TriReme insists upon, in other words, is not what the contract says. Paragraph 9(a) does not say that Dr. Lotan should list only complete and "formal inventions." It defined "Prior Inventions" as "all inventions, *original works of authorship, developments, improvements*, and trade secrets which were made by Consultant prior to the date of this Agreement . . . ." (ECF No. 36-2 at 3, ¶ 9(a)

ORDER DISMISSING CASE 14-2946 LB      8

(emphasis added).) The April 2003 study, as well as Dr. Lotan's report on that study and his "recommendations" for addressing the problem with the metal element detaching from the prototype catheter: these all fall within the plain meaning of the terms, "works of authorship, developments, [or] improvements." The agreement required Dr. Lotan to list such work in Exhibit C, if he was going to retain any rights in them, or (at most) license them to AngioScore for use in the catheter. To interpret this language as meaning only complete "inventions" would require the court to ignore the other terms — "works of authorship, developments, improvements" — and to treat these as surplus nullities. Such interpretations are disfavored. *See* Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable . . . .") The agreement further said, again in plain language, that if no such material was listed, then Dr. Lotan represented that there was no such work. If Dr. Lotan obtained rights in the catheter as a result of his pre-May 1, 2003 work — even if that work did not itself constitute a full-blown "formal invention" — he did not save those rights from being assigned to AngioScore.

### 2. *The "Prior Inventions" term does not merely grant a license*

Second, TriReme argues that the carve-out of paragraph 9(a) "at most . . . conveys to AngioScore a non-exclusive license to Prior Inventions . . . ." (ECF No. 37 at 19.) TriReme rests this argument on the title of the provision ("Inventions Retained and Licensed") and on the fact that the second segment of this provision grants AngioScore a non-exclusive license in any "Prior Inventions" that are incorporated into the company's products. (*See* ECF No. 36-2 at 3, ¶ 9(a).)

But this argument, too, quickens only by mangling the express terms of the consulting agreement and unraveling its manifest intent. First, the argument proceeds as if paragraph 9(a) addresses only licensing, when by its terms it address "Prior Inventions" that are both "retained" and "licensed." The fact that some Prior Inventions may be licensed does not rule out the possibility that some may be retained completely. Perhaps more substantively, TriReme offers an unacceptable reading of this contract term. The first part of paragraph 9(a), again, defines "Prior Inventions" and directs Dr. Lotan to list these on Exhibit C to retain them. The second part of paragraph 9(a) then says that, if any "Prior Inventions" are incorporated into an AngioScore product, then the company has a certain license to them. But this depends on there being Prior

ORDER DISMISSING CASE 14-2946 LB                                                                                            9

Inventions in the first place. And, because he did not list any such inventions on Exhibit C, Dr. Lotan represented that there were none.

### 3. *The standing analysis is not too "intertwined" with the merits*

Third, TriReme contends that the court should not rule on the motion to dismiss because "jurisdictional and substantive issues are inextricably intertwined." (ECF No. 37 at 22.) TriReme continues: "Jurisdictional finding of genuinely disputed facts is inappropriate when the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits of an action." (*Id.* (quoting *Sun Valley Gasoline, Inc. v. Ernst Enters., Inc.*, 711 F.2d 138, 139 (9th Cir. 1983)). TriReme contends that the "nature and timing" of Dr. Lotan's contribution to the catheter — whether he made an inventive contribution before May 1, 2003 that would entitle him to inventor status — is a central merits issue that overlaps the jurisdictional determination and thus prevents the court from ruling on standing. (ECF No. 37 at 22.)

The court disagrees. It goes without saying that subject-matter jurisdiction is a fundamental concern for a federal court. Without such jurisdiction, the court has no power to proceed. The court does not think that this case involves jurisdictional and merits issues that are so "intertwined" as to prevent the normal, primary resolution of jurisdiction. To the contrary. The facts that touch upon jurisdiction — even if they overlap to some degree with merits issues related to the nature of Dr. Lotan's inventive contribution — are nevertheless so basic that they permit resolution of the standing issue now. The jurisdictional decision here requires little more than a straightforward reading of the consulting agreement in light of the most preliminary facts. In this respect, this case is like the patent-correction and –infringement decisions in, for example, *Larson*, or *Jim Arnold*, where the Federal Circuit considered contractual assignments in light of equally basic facts to decide that plaintiffs lacked standing under either § 256 (*Larson*) or other parts of patent law. *See IMATEC, Ltd. v. Apple Computer, Inc.*, 15 F. App'x 887, 892 (Fed. Cir. 2001) (affirming standing dismissal of infringement claim where jurisdictional holding "turn[ed] on the proper construction of [an] assignment agreement").

///

### *4. TriReme carves up the contract and so loses its whole purpose*

Finally, the court addresses TriReme's broadest argument and basic approach to interpreting the 2003 consulting agreement. At the hearing on AngioScore's motion to dismiss, TriReme's counsel suggested that the court may be misunderstanding the contract. There are, counsel emphasized, two distinct terms in issue: the "Inventions Retained and Licensed" term of paragraph 9(a); and the main assignment clause of paragraph 9(b). Only the latter deals with assignments. No assignment can follow from the "Inventions Retained" provision of paragraph 9(a). Indeed, under TriReme's view, paragraph 9(a) ultimately has no effect. That paragraph addressed only full-blown, "formal" inventions; because Dr. Lotan's pre-May 1, 2003 work did not constitute such a complete invention, there was nothing for him to list as a "Prior Invention" under paragraph 9(a). In sum — and TriReme surely phrased it better — if we accept the rest of TriReme's arguments, then Dr. Lotan did no work after May 1, 2003 that could have been assigned to AngioScore under paragraph 9(b), and there was no "Prior Invention" for Dr. Lotan to retain under paragraph 9(a). Whatever rights Dr. Lotan gained from his April 2003 work remained with him to license to TriReme in 2014. Counsel urged that this conclusion followed from a due insistence on closely tracking the language of the consulting agreement.

The court has weighed this argument carefully. It concludes, however, that it is TriReme that misreads the contract. More precisely, TriReme hyper-parses the contract, walling off terms that must be read together. This leads TriReme to betray what the agreement's plain language reveals to be its objectively apparent purpose.

It will help to recall some rudiments of contract interpretation. The Federal Circuit tells us that California law controls the inquiry: "Construction of patent[-]assignment agreements is a matter of state contract law." *Preston v. Marathon Oil Co.*, 684 F.3d 1276, 1285 (Fed. Cir. 2012) (quoting *Euclid Chem Co. v. Vector Corrosion Techs., Inc.*, 561 F.3d 1340, 1343 (Fed. Cir. 1009)). "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." *Align Tech., Inc. v. Fed. Ins. Co.*, 673 F. Supp. 2d 957, 966 (N.D. Cal. 2009) (quoting *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1265 (1992)). "California recognizes the objective theory of contracts, under which it is *the objective intent, as evidenced by the words of*

*the contract*, rather than the subjective intent of one of the parties, that controls interpretation." *Cedars–Sinai Med. Ctr. v. Shewry*, 137 Cal. App. 4th 964, 980 (2006) (quoted in *Spacone v. Williamson*, 258 F. App'x 141(9th Cir. 2007) (mem.) (emphasis added)). "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . ." Cal. Civ. Code § 1639. Furthermore: "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Cal. Civ. Code § 1638. "Words in a contract which are *wholly inconsistent with its nature, or with the main intention of the parties*, are to be rejected." Cal. Civ. Code § 1653 (emphasis added). By short extension, and what is more important here, the court must equally reject proposed *interpretations* that are "wholly inconsistent" with a contract's "nature," or with the parties' (objectively apparent) "main intention." A final point will spotlight why TriReme's surgical approach does not persuade: "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practical, each clause helping to interpret the other." *Navarro v. Mukasey*, 518 F.3d 729, 734 (9th Cir. 2008) (applying California law); *see also, e.g.,* 4 S. Williston, *A Treatise on the Law of Contracts* § 618, at 710 (3d ed. 1961) ("A written contract must be read as a whole and every part interpreted with reference to the whole.").

Compartmentalizing contract terms that should instead be read together, TriReme's suggested approach and resulting interpretation parse too much; the plaintiff thereby both ignores the context that spawned the contract and thwarts the objectively apparent intent of the whole agreement. (Naming each letter, we will fail to read the word.) Consider the parties' description of Dr. Lotan's and AngioScore's circumstances in 2003. The parties dispute nothing in this respect. The parties who entered this agreement — Dr. Lotan on the one hand and, on the other, the few people who constituted AngioScore — were then a handful of people in a medical startup. Their one product-to-be — the thing on which they were all focused — was the catheter. The purpose of the consulting agreement's two salient clauses (paragraphs 9(a) and 9(b)) — and it is well to notice that these are subparagraphs of one larger section on "Inventions" — was to identify any preexisting work that Dr. Lotan was doing that might compete with the developing catheter, license such work to AngioScore if any was incorporated into the catheter, and otherwise to assign

to AngioScore whatever rights Dr. Lotan's work on the catheter might have given him. That purpose is apparent from the contract's plain language.[4] To reach TriReme's different conclusion, to find that Dr. Lotan somehow retained rights that he could later license to TriReme, goes beyond a fair reading of the contract into casuistic over-dissection. If we wall the two salient clauses off from one another, as TriReme urges, the intent of the whole contract falls between them and is lost. Furthermore, TriReme's analysis depends on at least one subsidiary argument that (as discussed above) is unacceptable: *i.e.,* the idea that the "Prior Inventions" term of paragraph 9(a) applies to only fully finalized, "formal" inventions. For these reasons, the court cannot accept TriReme's contractual analysis.

## II. DR. LOTAN WORKED ON THE CATHETER AFTER MAY 1, 2003

Moreover, the May 1, 2003 consulting agreement is what compensated Dr. Lotan, defined his obligations (including confidentiality), and enabled his continued work on the catheter after May 1, 2003. Whatever rights he had in the catheter were thus assigned to AngioScore, apart from any consideration of the "Prior Inventions" exclusion, under the main assignment clause. That term, again, assigned to AngioScore "all right, title and interest in and to all inventions, original works of authorship, developments, concepts, know-how, [and] improvements . . . that Consultant may . . . *conceive or develop or reduce to practice* during the term of this Agreement that relate to the Services . . . ." (ECF No. 36-2 at 3, ¶ 9(b) (emphasis added).) Dr. Lotan testified that after April 2003 he continued to work on catheter-related issues under the terms of his consulting contract with AngioScore. (ECF No. 36-4 at 53-56, 74-75, 125-27.) He recounts "talking" with AngioScore and "plann[ing] on human studies" for the catheter in the summer of 2003. (*Id.* at 75.) Some of these studies did not come to pass; some did. (*Id.* at 74-75.) Dr. Lotan not only helped

---

[4] It is appropriate to consider the surrounding circumstances when assessing the meaning of this contract. California looks more readily than most states to "extrinsic evidence" in interpreting contracts. *See, e.g., Monolithic Power Sys., Inc. v. Taiwan Sumida Elecs., Inc.*, 2006 WL 1530073, *2 (N.D. Cal. June 2, 2006) ("[I]n applying California law to contracts, courts often look to extrinsic evidence. California Code of Civil Procedure § 1856 provides that . . . *evidence of the circumstances under which the agreement was made*, or evidence to explain an extrinsic ambiguity *or otherwise interpret the terms of the agreement*, may be considered.") (emphases added) (internal quotation omitted).

"design[]" some of these human trials (*id.* at 53-55); he personally conducted some of them (*id.* at 125-27). He also testified that he was involved in the "interpretation of [this] clinical data" under the consulting agreement. (*Id.* at 54.) This is exactly the sort of work that his consulting agreement anticipates. (*See* ECF No. 36-2 at 6 (describing consulting services).) Again under the plain meaning of section 9(b)'s terms, this work might have amounted to (among other things) "developing," "improving," or "reducing to practice" the "recommendations" that Dr. Lotan made in April 2003 for improving the prototype catheter — and this is accepting TriReme's position that Dr. Lotan's contributions were included in the patented catheter.

At the hearing, TriReme argued that Dr. Lotan's work during the consulting agreement amounted to collecting regulatory data on a finished device. That may be true, yet it does not change the outcome. The court assumes that the inventive contribution was complete by April 2003 and does not need to consider the issue — which the parties did not fully brief — about when an idea penciled into a recommendation becomes an inventive idea. The point is only that purpose of the entire consulting agreement was to define the parties' obligations, enable Dr. Lotan's continued work on the only product at issue, and provide for his compensation.

### III.   ANALOGIES

The court thus concludes that Dr. Lotan assigned whatever interest he had in the balloon catheter to AngioScore in 2003. He had no rights in the catheter to license to TriReme in 2014. Consequently, TriReme has no interest in the patents-in-suit sufficient to support standing under § 256.

This conclusion is consistent with governing precedent. For example, this case is effectively identical to *Larson, supra*, in which the Federal Circuit held that an assignor-inventor had "no constitutional standing to sue for correction of inventorship" under § 256. *Larson*, 569 F.3d at 1325-27. The *Larson* plaintiff had assigned his rights in an invention to his employer under an employment contract. *Id.* at 1322. He later sued to be added as an inventor on the attendant patents. *Id.* at 1321-23. The district court granted summary judgment for the defendant and Larson appealed. *Id.* at 1322-23. Bypassing the summary-judgment issue, the Federal Circuit asked whether the plaintiff had sufficiently laid federal subject-matter jurisdiction. *Id.* at 1323. It held

1  that he had not. *Id.* at 1325-27. That court wrote: "Larson has affirmatively transferred title to the
2  patents to [the defendant], and he stands to reap no benefit from a preexisting licensing or royalties
3  arrangement." *Id.* at 1326. He thus had "no concrete financial interest" in the patents (*id.* at 1321);
4  and, more precisely, "no financial interest in the patents sufficient for him to have standing to
5  pursue a § 256 claim." *Id.* at 1326-27. The district court thus "lacked jurisdiction" to hear the
6  § 256 challenge, and the appellate court directed that the case be remanded back to the Florida
7  state court from which it had been removed. *Id.* at 1327-28.

8      In reaching this decision, the *Larson* court expressly drew on its "similar" decision in *Jim
9  Arnold, supra*. *Larson*, 569 F.3d at 1327. In *Jim Arnold*, an inventor sued for patent infringement.
10 Like Dr. Lotan, though, he had already "assigned away all his . . . rights" and thus had "no
11 ownership interest" in the subject patents. *Id.* at 1327 (discussing *Jim Arnold*, 109 F.3d at 1571-
12 72). The *Jim Arnold* court too held, consequently, that "the plaintiff lacked standing to pursue his
13 infringement claim." *See Jim Arnold*, 109 F.3d at 1572. "Although *Jim Arnold* involved an
14 infringement claim rather than an action to correct inventorship, the reasoning of that case
15 nonetheless applies" to § 256 claims. *Larson*, 569 F.3d at 1327.

16     Finally, the decision in *IMATEC, Ltd. v. Apple Computer, Inc.*, 15 F. App'x 887 (Fed. Cir.
17 2001) further compels the conclusion that TriReme lacks constitutional standing to bring a § 256
18 claim. The undisputed inventor of several video-imaging patents there sued Apple for infringing
19 on those patents. *Id.* at 888-90. The district court granted summary judgment for the defendant,
20 based on a lack of constitutional standing, and the Federal Circuit affirmed. Like Dr. Lotan, the
21 *IMATEC* inventor had previously assigned away his rights in the patents to the employer he was
22 working for when he developed them. *Id.* at 889-90. The employment contract in *IMATEC* had
23 provided a place for the plaintiff to exclude specified inventions from the assignment; but the
24 district court concluded that the patents-in-suit were not among those that the plaintiff had listed
25 for exclusion. *Id.* The appellate court upheld this determination. It also upheld the follow-on
26 jurisdictional conclusion that, because the plaintiff had "assigned his rights to the patented
27 inventions," he "lacked standing to bring [an] infringement suit." *Id.* at 893-96. The Federal
28 Circuit's decision in *Preston v. Marathon Oil Co.*, 684 F.3d 1276, 1285 (Fed. Cir. 2012), though

different in details, is to the same ultimate effect.

## CONCLUSION

Because Dr. Lotan assigned whatever rights he had in the patents-in-suit to AngioScore under the terms of the 2003 consulting agreement, he had no rights in those patents to license to TriReme in 2014. TriReme has no interest in the patents sufficient to give it constitutional standing to pursue a claim for correction of inventorship on those patents under 35 U.S.C § 256. The court therefore grants AngioScore's motion to dismiss and dismisses this case with prejudice.

This disposes of ECF No. 36.

**IT IS SO ORDERED.**

Dated: March 17, 2015

_____
LAUREL BEELER
United States Magistrate Judge